UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case Number: 21-20585-CIV-MARTINEZ

CORPORATE REAL ESTATE
SOLUTIONS, LLC,

    Plaintiff,

v.

BOYD WATTERSON ASSET
MANAGEMENT, LLC,

    Defendant.
_____/

### ORDER ON MOTION TO DISMISS SECOND AMENDED COMPLAINT

**THIS CAUSE** comes before the Court on Defendant Boyd Watterson Asset Management, LLC ("Boyd")'s Consolidated Motion to Dismiss for Lack of Personal Jurisdiction, and, in the Alternative, for Failure to State a Claim ("Motion to Dismiss"). (ECF No. 44). After careful consideration of the motion-to-dismiss briefing and evidence presented at the evidentiary hearing, the Court grants the motion to dismiss on the basis of lack of personal jurisdiction.

**I.**    **SUMMARY OF RELEVANT FACTS**

   **A. Procedural Background**

Boyd removed the case to this Court in February 2021. (ECF No. 1). About a week after removal, Boyd moved to dismiss for lack of personal jurisdiction and failure to state a claim. (ECF No. 4). Rather than respond, Plaintiff Corporate Real Estate Solutions, LLC ("CRES") moved to amend its complaint to address issues raised in the motion to dismiss. (ECF No. 14). The Court granted leave to amend, and CRES filed the Amended Complaint. (ECF Nos. 17 & 18). The Amended Complaint asserted four claims against Boyd: (1) breach of an implied-in-fact contract

in May 2019 by failing to pay CRES a 2% commission from the sale of a property located in Nebraska ("Nebraska Transaction") (Count I); (2) unjust enrichment from failing to pay the same commission (Count II); (3) declaratory judgment as to pending deal packages CRES provided Boyd (Count III); and (4) tortious interference with a business relationship (Count IV).  (ECF No. 18).  Again, Boyd moved to dismiss.  (ECF No. 21).  The Court dismissed the complaint for lack of personal jurisdiction, concluding that "[a]t bottom, this case is about a non-resident Defendant's alleged wrongful conduct with respect to properties located outside of Florida."  (ECF No. 38 at 15).  The Court granted leave to amend.  (*Id.*).

CRES filed the operative, Second Amended Complaint realleging Counts I, II, and III asserted in the Amended Complaint.  (SAC ¶¶ 39–56, ECF No. 41).  Like the prior iteration, the operative Complaint arises out of Boyd's alleged breach of an implied-in-fact contract by failing to pay CRES the commission owed on the Nebraska Transaction.  (*See id.*).  Boyd filed the Motion to Dismiss, and in support thereof, submitted the Declaration of Thomas J. Tarantino, the Executive Vice President, General Counsel, and Chief Compliance Officer of Boyd.  (Sept. 21, 2021, Decl. of Thomas Tarantino ("Tarantino Decl.") ¶ 3, ECF No. 44-2).  In response, CRES filed the Declaration of George L. Castilla, the Chief Executive Officer, Chief Investment Officer, sole owner, and managing member of CRES.  (Oct. 24, 2021, Decl. of George L. Castilla ("Castilla Decl.") ¶ 3, ECF No. 52-1).  In reply in support of the Motion to Dismiss, Boyd filed the Declaration of Joseph Capra, the Senior Vice President and Head of Acquisitions of Boyd.  (Nov. 11, 2021, Decl. of Joseph Capra ("Capra Decl.") ¶ 3, ECF No. 53-1).

To resolve the conflicting statements made in the parties' jurisdictional declarations, the Court held an evidentiary hearing on personal jurisdiction.  (*See* ECF No. 60).  The parties introduced evidence at the hearing, and both Mr. Castilla and Mr. Capra testified.  After the

hearing, and at the direction of the Court, the parties submitted written closing arguments on the personal jurisdiction issue. (ECF Nos. 62 & 63). The Motion to Dismiss is now ripe for review.

### B. Factual Background

#### 1. The Parties

CRES is a real estate broker. (Apr. 8, 2022, Evidentiary Hr'g Tr. at 4:24–5:21, ECF No. 61). When CRES identifies a potential investment property for sale, it creates a deal package on the property containing information on pricing, lease and property tax examinations, valuation, and financing. (Castilla Decl. ¶ 5). Generally, if a property is sold using one of CRES's deal packages, CRES earns a commission. (*See id.* ¶ 6).

Defendant Boyd is a wholly-owned subsidiary of Boyd Watterson Holding Co., also known as Titanium Asset Management Corp. ("Titanium"). (Tarantino Decl. ¶ 5). Boyd is an asset management and investment company incorporated in Ohio with a principal place of business in Illinois. (*Id.*; Tr. at 20:23–21:15). Boyd manages its commercial real estate business from its Ohio and Illinois offices. (Tarantino Decl. ¶ 7).

#### 2. The "Implied Contract," Nebraska Transaction, and Palm Beach Transaction

CRES alleged that from 2011 through 2019, CRES and Boyd engaged in a course of dealing that created a binding implied-in-fact contract. (SAC ¶ 40). The alleged terms of the implied contract were that CRES would offer Boyd its deal packages, and if Boyd used a deal package to purchase property, Boyd would pay CRES a commission from the sale. (SAC ¶¶ 39–42). CRES alleged that in May 2019, Boyd breached the implied contract when it failed to pay CRES a commission on the Nebraska Transaction. (*Id.*)

At the evidentiary hearing, Mr. Castilla testified that the alleged implied contract between Boyd and CRES arose from (1) the terms of a July 2011, Confidentiality and Broker Fee Agreement between CRES and Titanium ("Agreement") (Boyd Ex. E; CRES Ex. 4), and (2) an e-

3

mail between Mr. Castilla and Mr. Capra, dated April 29, 2019 ("E-Mail") (Tr. at 25:15–26:11; Boyd Ex. N). (*See* Tr. at 8:7–9:1). In the Agreement, Titanium, defined as the "Prospective Purchaser/Agent," agreed to certain terms of confidentiality with CRES regarding information CRES provided to Titanium on a portfolio of property located in Florida, Texas, and Minnesota. (*See* Agreement at 1). CRES and non-party Syndicated Capital, LLC are defined as the "Brokers" in the Agreement. (Agreement ¶ 9). The Agreement provided that the "seller of record will be registered and responsible for compensating the 'Broker's' of record a total of 1.25% of the purchase price herewith registered for their professional procurement services at a successful closing." (Agreement ¶ 11; *see also* Tr. at 30:5–9).

With respect to the E-Mail, Mr. Castilla testified that he met with Mr. Capra in Palm Beach, Florida, "to discuss the Palm Beach deal" (the "Palm Beach Transaction") and to "reiterate[] that we had other deals in progress and Nebraska was the next target, and that I had it pretty much ready to go." (Tr. at 9:2:15). Mr. Castilla testified that at the meeting he informed Mr. Capra that he "would be sending him these other opportunities, because we were always encouraged to . . . bring deals that are off market[.]" (Tr. at 9:2–5). Mr. Capra represents that they never discussed the Nebraska Transaction at the meeting in Palm Beach. (Capra Decl. ¶ 7).

Following the Palm Beach meeting, Mr. Castilla testified that he sent the E-Mail to Mr. Capra about the Palm Beach Transaction in which Mr. Capra agreed that Boyd would "not close on a deal if the seller is in violation of the brokerage agreement between CRES Global and seller." (Tr. at 33:1–6). In fact, the E-Mail states "Joe, pursuant to our recent telecon[,] confirming that [Boyd] will never close a CRES/[Boyd] PSA unless CRES hard earned & legally entitled fee is protected and paid by seller is very much appreciated. That's exactly the reason that CRES provides [Boyd] first right of refusal on all of CRES Federal-GSA investment opportunities." (Boyd Ex. N at 2, ECF No. 64-14).

4

The Palm Beach Transaction is memorialized in a June 2018 purchase and sale agreement between the seller of the property, South Florida Federal Partners West Palm Beach, LLC, and the buyer, Boyd Royal Palm Beach, LLC ("Royal Palm")—both non-parties to this case. (Def.'s Ex. L, ECF No. 64-12). CRES acted as the broker to the Palm Beach Transaction. (*Id.* at 2). The Final Settlement Statement from the Palm Beach Transaction shows that CRES was charged a 7% sales tax, in the amount of $26,000.00. (Def's Ex. M at 2, ECF No. 64-13).

3. **Florida Offices and Property**

Boyd was registered as a foreign business in Florida until February 2018, when it opened an office in Brandon, Florida, to accommodate an employee who resides there. (Tarantino Decl. ¶ 6). The Brandon office has never been involved in Boyd's real estate operations. (*Id.* ¶ 6). Rather, work conducted from the Brandon office involves institutional sales, primarily for fixed income money management. (*Id.* ¶ 6).

Mr. Castilla testified that he "think[s]" Boyd "had an office in Sarasota, Florida with a company called Wood Asset Management." (Tr. at 18:4–16). He testified that Wood Asset Management "was one of the companies that Boyd Titanium purchased, and that company is called Wood Asset Management out of Sarasota." (*Id.*). In addition, Mr. Castilla's Declaration states that he reviewed U.S. Securities and Exchange ("SEC") filings that supposedly confirm Boyd maintains an office in Tampa, Florida. (Castilla Decl. ¶ 10). Mr. Castilla has no knowledge of any activities conducted by Boyd in the Tampa office. (Tr. at 43:4–7). The SEC filings were not introduced into evidence at the evidentiary hearing or attached to Mr. Castilla's Declaration.

Boyd is the investment manager of certain Delaware limited partnership funds ("LPs") that hold Maryland real estate investment trust ("REIT") subsidiaries. (Tarantino ¶ 8). The REIT subsidiaries acquire properties—eighteen of which are located in Florida—to be held in Delaware limited liability companies ("LLCs"). (*Id.*; Capra Decl. ¶ 9; Castilla Decl. ¶ 9). Boyd has formed

5

Delaware LLCs for the REIT subsidiaries in its role as investment manager of the Delaware LPs. (Tarantino Decl. ¶ 8). Third parties manage the properties held by the Delaware LLCs. (*Id.*). As stated by Mr. Capra, "Boyd has advised investors who later formed LLCs that later owned other properties in Florida." (Tr. at 46:2–3). None of the Delaware LLCs have any connection to the Nebraska Transaction or any of the deal packages at issue in this dispute. (Tarantino Decl. ¶ 8). Mr. Castilla has no knowledge of Boyd ever closing any real estate transaction in Florida where CRES acted as the broker. (Tr. at 41:4–13).

Boyd does not own any property in Florida. (Tr. at 46:4–8; Capra Decl. ¶ 10; Tarantino Decl. ¶ 8). At the evidentiary hearing, CRES's counsel attempted to impeach Mr. Capra's testimony that Boyd does not own any property in Florida by showing Mr. Capra a public filing available on Florida's Department of State Division of Corporations ("Sunbiz"). (Tr. at 46:13–47:9). Mr. Capra confirmed that Boyd was listed on the Sunbiz filing, which showed, according to CRES's counsel, that Boyd was "at one time an owner of Nathan Lee Head of Tallahasse, [LLC]" ("Nathan Lee"). (*Id.*). Neither the Court nor Boyd's counsel were provided with a copy of the Subiz filing before or during the hearing. Nathan Lee is a Florida real estate developer that held a contract with the State of Florida for the lease and construction of properties in the Tallahassee area. (Tr. at 45:7–20). Nathan Lee sold its interests in the contract to a developer in Iowa, who developed the properties and sold them to a fund advised by Boyd. (Castilla Decl. ¶ 11; Capra Decl. ¶ 10; Tr. at 19:9–24, 45:7–17).

C. **LEGAL STANDARD**

"When a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss, the district court must hear and decide the issue 'before trial unless the court orders a deferral until trial.'" *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364 (11th Cir. 2021) (quoting Fed. R. Civ. P. 12(i)). By the close of evidence, plaintiff must "establish personal jurisdiction by a

6

preponderance of the evidence." *Id.* In its discretion, the Court may "impose the preponderance-of-the-evidence standard, right away, during the pre-trial phase, by conducting an evidentiary hearing" or wait until trial. *Id.* If "the court holds an evidentiary hearing to adjudicate the issue of whether the court has jurisdiction over the defendant's person, the court determines the credibility of witness testimony, weighs the evidence, and finds the relevant jurisdictional facts." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010).

### D. DISCUSSION

To exercise personal jurisdiction over a nonresident defendant, the plaintiff must satisfy (1) Florida's long-arm statute, and (2) due process requirements under the Fourteenth Amendment of the Constitution. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013). The Court must strictly construe Florida's long-arm statute and apply it "as would the Florida Supreme Court." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (citation omitted). As explained below, CRES did not satisfied Florida's long-arm statute or constitutional due process requirements.

### A. Florida's Long-Arm Statute

#### 1. Specific Personal Jurisdiction

Plaintiff contends that the Court can exercise specific personal jurisdiction over Boyd under Florida's long-arm statute for (1) conducting a business in Florida, (2) owning real property in Florida, and (3) breaching a contract that requires acts to be performed in Florida. (ECF No. 62 at 2).[1]

---

[1] The Second Amended Complaint alleges that the Court can exercise jurisdiction over Boyd for committing tortious conduct in Florida under section 49.193(1)(a)(2). (SAC ¶ 4). But CRES did not present any evidence on this jurisdictional subsection, and in its closing argument stated that it asserts jurisdiction only under subsections (1)(a)(1), (3), and (7) of the long-arm statute. (ECF No. 62 at 2). The Court takes this lack of argument and evidence to mean CRES no longer asserts that the Court can exercise jurisdiction under subsection (1)(a)(2).

### *i.     Engaging in a Business Venture in Florida*

A nonresident defendant is subject to the personal jurisdiction of this Court under section 48.193(1)(a)(1) "for any cause of action arising from . . . [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." § 48.193(1)(a)(1), Fla. Stat.   To establish that Boyd is carrying on a business venture in Florida under section 48.191(1)(a)(1), "the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000).  In determining whether the defendant conducts a business in Florida, the Court considers relevant but not dispositive factors, such as (1) "the presence and operation of an office in Florida," (2) "the possession and maintenance of a license to do business in Florida," (3) "the number of Florida clients served," and (3) "the percentage of overall revenue gleaned from Florida clients." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005).

CRES has not put forth any evidence curing the deficiencies that resulted in the dismissal of the prior complaint.  There is no evidence that Boyd has ever had Florida clients, obtained revenue from Florida, or that its Florida office(s) or Florida business license are in any way involved in Boyd's real estate business.  Boyd's relationship with Nathan Lee—to the extent there is any—has nothing to do with the Nebraska Transaction.  Boyd advising investors who later formed LLCs to hold Florida properties, or Boyd forming LLCs holding Florida properties on behalf of investors, is unrelated to the Nebraska Transaction.  And even if that corporate formation conduct was related to the Nebraska Transaction, it is not enough to show a general course of business activity in Florida.  Stated differently, none of the claims arise out of any business Boyd conducted in Florida.

### ii.     *Real Property in Florida*

The Court can exercise specific personal jurisdiction under section 48.193(1)(a)(3) over a nonresident defendant "for any cause of action arising from . . . [o]wning, using, possessing, or holding a mortgage or other lien on any real property within this State." § 48.193(1)(a)(3), Fla. Stat.  CRES argues that this subsection is satisfied because "Boyd has advised investors who later formed LLCs that later owned properties in Florida," and because Boyd-related entities purchased properties in Florida.  (ECF No. 62 at 4).  The Court cannot assert personal jurisdiction over Boyd based on the conduct of investors or non-party affiliates when there is no allegation, let alone evidence, that these investors or entities were alter egos of Boyd.  Again, CRES has presented no evidence that Boyd itself has any real property interest in Florida.

### iii.    *Breaching a Contract Requiring Acts in Florida*

The Court can also exercise specific personal jurisdiction under section 48.193(1)(a)(7) over a nonresident defendant "for any cause of action arising from . . . [b]reaching a contract in this state by failing to perform acts required by the contract to be performed in this state."  § 48.193(1)(a)(7), Fla. Stat.  Jurisdiction under subsection 48.193(1)(a)(7) requires there "exist a duty to perform an act *in Florida*; a contractual duty to tender performance to a Florida resident is not in itself sufficient to satisfy the statute." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1218 (11th Cir. 1999) (emphasis in original).  "It is not enough that a foreign defendant merely contract with a Florida resident, or that performance under the contract could have been made in Florida; rather, the contract itself must require performance in Florida[.]"  *Olson v. Robbie*, 141 So. 3d 636, 640 (Fla. 4th DCA 2014).

To begin, the Court is skeptical that a contract even exists between Boyd and CRES.  The Agreement cannot form the basis of the implied-in-fact contract between Boyd and CRES because "the existence of an express contract precludes the existence of an implied contract dealing with

9

the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed. Cir. 1990); *see also Davidson v. Maraj*, 609 F. App'x 994, 998 (11th Cir. 2015) (explaining that an implied contract "is one not created or evidenced by distinct and explicit language") (citation omitted)). The Agreement is an express contract between Titanium and CRES, not Boyd. Even though CRES believes "Boyd should have been part of this agreement," (Tr. at 28:7–12), it was not.

The E-Mail between Mr. Castilla and Mr. Capra does not advance CRES's jurisdictional argument any further. At most, Boyd agreed to not close any deal brokered by CRES until the seller paid CRES its commission. (*See* Boyd Ex. N at 2). But Boyd never promised to pay CRES a commission—that was always the seller's responsibility. (*See* Tr. at 49:12–16). Nor did Boyd ever close a transaction with CRES acting as a broker for property in Florida. (Tr. at 49:17–22). The Palm Beach Transaction is irrelevant because it did not involve Boyd. (*See* CRES Ex. L). CRES did not present any evidence that the $26,000 "seller shortfall" Boyd purportedly paid CRES in Florida was anything more than the sales tax on the Palm Beach Transaction that, again, did not involve Boyd. (*See* CRES Ex. M). In short, even if there was an implied contract between Boyd and CRES, it did not require any conduct by Boyd in Florida.

### 2. **General Personal Jurisdiction**

CRES also argues that the Court can exercise general personal jurisdiction over Boyd based on its business contacts with Florida. (ECF No. 62 at 2). The reach of general jurisdiction under Florida's long-arm statute "extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment." *Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1204 (11th Cir. 2015). Accordingly, the general jurisdiction analysis under Florida's long-arm statute and due process are the same. *See id.; Ferenchak v. Zormati*, No. 21-cv-22401, 2021 U.S. Dist. LEXIS 220524, at *11 (S.D. Fla. Nov. 15, 2021). The Court can exercise general personal

jurisdiction over nonresident defendant based on its (1) place of incorporation, or (2) principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Absent the "paradigm all-purpose forums," the Court may only exercise general jurisdiction over a nonresident defendant in the "exceptional" case where a "foreign corporation is 'at home' in a forum other than its place of incorporation or principal place of business." *Carmouche*, 789 F.3d at 1204.

There is no dispute that Boyd is incorporated in Ohio with its principal place of business in Illinois. (SAC ¶ 15; Tr. at 20:23–21:15). CRES has not demonstrated that any exceptional circumstances warrant a finding of general jurisdiction over Boyd in Florida in this case. Therefore, the Court cannot exercise general jurisdiction over Boyd.

### B. Due Process

Even if the exercise of specific personal jurisdiction over Boyd complied with Florida's long-arm statute—it does not—the Court would still decline to exercise jurisdiction over Boyd because doing so would not comport with due process. The three-part due process test examines "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton*, 736 F.3d at 1355. Focusing on the purposeful availment prong, the Court evaluates whether Boyd's contacts with Florida "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within [Florida]; and (3) are such that the defendant should reasonably anticipate being haled into court in [Florida]." *Louis Vuitton*, 736 F.3d at 1357.

Here, the only identifiable contact Boyd may have had with Florida related to this action is Mr. Castilla's reference to the Nebraska property at the meeting in Palm Beach. (*See* Tr. 9:2–15). Even in Mr. Castilla did refer to the Nebraska property at the Palm Beach meeting—Mr. Capra disputes this ever happened (Capra Decl. ¶ 7)—that is not nearly enough to show purposeful availment by Boyd when no substantive negotiations took place. *Cf. Complete Concepts, Ltd. v. General Handbag Corp.*, 880 F.2d 382, 388 (11th Cir. 1989) ("This court has recognized that '[a] meeting in the forum state may constitute purposeful availment if it involves significant negotiations of important terms' as opposed to the execution of a boiler plate contract." (citation omitted)). Indeed, the basic terms of the Nebraska Transaction remain unclear, such as how and when the transaction was executed and by whom. In the absence of any further contacts with Florida related to the claims, exercising personal jurisdiction over Boyd would violate due process.

### E. CONCLUSION

To conclude, CRES has not shown by a preponderance that the Court can exercise jurisdiction over Boyd. The jurisdictionally relevant contacts are unrelated to the claims or Boyd, or both. It is hereby **ORDERED AND ADJUDGED** that

1. Defendant's Motion to Dismiss, (ECF No. 44), is **GRANTED**. The Complaint is **DISMISSED** for lack of personal jurisdiction.

2. The Clerk of Court is **DIRECTED** to mark this case as **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 20th day of April, 2022.

*[Signature]*
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Becerra
All counsel of record